STATE OF CONNECTICUT        :

                            :  ss:    Bridgeport, Connecticut

COUNTY OF FAIRFIELD         :         March 2, 2011

AFFIDAVIT

I, Stacy G. Bowery, being duly sworn, hereby depose and
state:

1.  I am a Special Agent of the Federal Bureau of
Investigation (FBI), and have been so employed for approximately
13 years.  I am currently assigned to a White Collar squad in the
FBI's Bridgeport Resident Agency.  In my role as a Special Agent
of the FBI, I have received training in conducting criminal
investigations, and I am familiar with the procedures of the FBI.
As a Special Agent of the FBI, I have participated in numerous
criminal investigations involving violations of federal criminal
law, including investigations of organized crime, as well as
criminal investigations involving mail fraud and wire fraud,
money laundering, mortgage fraud and bank fraud offenses, as well
as other financial frauds.

2.  I make this affidavit in support of a two-count criminal
complaint seeking an arrest warrant for **JUAN CARLOS GUILLEN ZERPA**
(hereafter, **"GUILLEN"**) on charges of: Count One – conspiracy to
obstruct justice, to obstruct an official proceeding, and to
defraud the U.S. Securities and Exchange Commission ("SEC"),
contrary to 18 U.S.C. §§ 1503, 1512, and 371, all of which is in
violation of 18 U.S.C. § 371; and Count Two – obstruction of an

official proceeding, in violation of 18 U.S.C. §§ 1512 and 2.

3.   The information contained in this affidavit is based upon my personal knowledge developed during the investigation, my review of documents, information supplied to me by other agents and officers, including conversations with and information I have obtained from FBI Special Agent Jason M. Breen, who is the case agent on this investigation, information that I have learned about information supplied by a confidential human source ("CHS"), my review of preliminary draft transcripts of consensually recorded phone calls, as well as emails and text messages involving the CHS, **GUILLEN** and/or others, and information and documents made available to the FBI by representatives of the SEC, as well as information the FBI obtained from a court-appointed receiver and his staff.  The facts set forth herein do not represent every fact known to me or every fact developed during the course of the investigation, which is ongoing.  Due to the ongoing nature of the investigation, I respectfully request that this affidavit as well as the criminal complaint and any arrest warrant issued by the Court in this matter, be sealed until further Order of this Court or other Court.

## Applicable Law

4.   Section 371 of Title 18 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the

2

United States, or any agency thereof in any manner or
for any purpose, and one or more of such persons do any
act to effect the object of the conspiracy, each shall
be fined under this title or imprisoned not more than
five years, or both.

Section 1503 of Title 18 provides in pertinent part:

Whoever . . . corruptly . . . influences, obstructs, or
impedes, or endeavors to influence, obstruct, or
impede, the due administration of justice, shall be
punished as provided in subsection (b).

Section 1512 of Title 18 provides in pertinent part:

Whoever corruptly . . . obstructs, influences, or
impedes any official proceeding, or attempts to do so,
shall be fined under this title or imprisoned not more
than 20 years, or both.

Section 1512 further provides, in pertinent part, that "an

official proceeding need not be pending or about to be instituted

at the time of the offense. . . ."  Moreover, Section 1512

provides that there is "extraterritorial Federal jurisdiction

over an offense under this section."

## Background of the Investigation

5.   I am working with other FBI agents on an investigation

of various individuals and entities, including the Michael

Kenwood Group, LLC (hereafter, the "MK Group"), an affiliated

entity called Michael Kenwood Capital Management, LLC (hereafter,

"MK Capital") and other related entities and hedge funds, as well

as another entity that is a registered investment adviser and

hedge funds it advises.  The investigation has revealed that some

of the hedge funds involved include the Short Term Liquidity Fund

3

(hereafter, "STLF"), the MK Venezuela Fund (hereafter, the "MK VZ Fund"), the MK Special Opportunities Fund (hereafter, "SOF"), and others.  The various hedge funds involved in this investigation, including the ones identified in the previous sentence, will be referred to herein collectively as the "Funds".

6.    The investigation is focused on a fraud scheme occurring in Connecticut and elsewhere from approximately 2006 to 2011 to defraud investors and creditors of various hedge funds advised by these and related entities.  Part of the investigation is focused on a person who will be referred to herein as a confidential human source (the "CHS"), **GUILLEN** and others, including a former Venezuelan banker living in Florida who will be referred to herein as the "Middleman."  **GUILLEN** is an accountant in Venezuela and practices in a firm associated with a major international accounting firm.  As set forth in greater detail below, the investigation shows that the CHS, **GUILLEN**, the Middleman and others all participated in a conspiracy to falsify an asset verification letter on behalf of STLF which purported to verify that STLF was owed money by various Venezuelan companies. The letter attested that the loans in total amounted to at least approximately $275 million, when the CHS, **GUILLEN** and the Middleman all knew that no such loans were owed to STLF.  The letter, which will be referred to herein as the "Fictitious Asset Verification Letter," was false.  The conspiracy included

4

providing the Fictitious Asset Verification Letter to the SEC in the course of its official investigation.  The co-conspirators also caused the Fictitious Asset Verification Letter to be supplied to the business advisers appointed by the district court in connection with a civil suit filed by the SEC and styled *SEC v. Illarramendi, et al.*, 3:11-cv-00078 (JBA) (hereafter, the "SEC Action").

7.    During the course of the investigation, the CHS approached the FBI to provide information concerning a scheme to defraud relating to the Funds.  The CHS has admitted directing the scheme to defraud.  The CHS has provided information in the government's investigation and is expected to enter a plea of guilty to various federal felony charges, including fraud charges and conspiracy to obstruct justice, to obstruct an official proceeding, and to defraud, among others, the SEC.  The CHS hopes that the information he has provided will be called to the attention of the sentencing court at the time of sentencing.  The information provided by the CHS relating to **GUILLEN**, the Middleman and others has been corroborated by, among other things, public records, preliminary draft translations of consensual recordings, email and text communications, bank records and the FBI's criminal investigation.

## The SEC Investigation and Lawsuit

8.   The SEC is a federal government agency authorized by law to investigate possible violations of securities laws, conduct official enforcement investigations, and file civil actions to protect investors in connection with the purchase and sale of securities.

9.   Beginning in 2010, the SEC, as part of its official investigative and enforcement authority, sought information and documentation from the CHS and the MK Group in an official SEC enforcement matter bearing SEC File # B-2507.  As part of its enforcement authority, the SEC served a subpoena for records upon the MK Group.  In December 2010 and January 2011, the SEC conducted an enforcement-directed review of the MK Group and related entities as part of its official enforcement investigation.  In or about early January 2011, the CHS caused the Fictitious Asset Verification Letter to be provided to the SEC, in furtherance of the conspiracy.

10.   On or about January 14, 2011, the SEC filed the SEC Action.  The SEC alleged, among other charges, that investor funds were misappropriated from STLF and the MK VZ Fund.  The SEC sought, among other remedies, an injunction and an accounting of investor funds.  Subsequent to the filing of the SEC Action, the court appointed, and sought input from, business advisers and a receiver to ascertain the assets and liabilities of the hedge

funds affiliated with the MK Group, among other tasks.

### The Scheme to Defraud and the Conspiracy

11.  In the course of the FBI's investigation, the CHS, through counsel, requested an opportunity to meet with the FBI and the U.S. Attorney's Office for the District of Connecticut. The CHS has since begun providing information to the government relating to its investigation.  The CHS has admitted, among other things, to engaging in a scheme and artifice to defraud investors and creditors of the Funds and related entities, and conspiring with others, including **GUILLEN** and the Middleman, to obstruct justice, to obstruct an SEC investigation and to defraud the SEC. The CHS has provided a substantial amount of information, not all of which is contained in this affidavit.  Rather, this affidavit in support of a criminal complaint against **GUILLEN** sets forth only that information necessary to establish probable cause in support of the two-count criminal complaint against **GUILLEN.**

12.  According to the CHS, one of the principal goals of the scheme the CHS engaged in was to disguise the fact that Funds and related entities the CHS managed and advised have outstanding liabilities that greatly exceed the current value of their assets, exposing investors and creditors to the risk of suffering losses potentially as high as hundreds of millions of dollars.

13.  The CHS has advised, among other things, that the fraud took place from in or about 2006 to in or about February 2011.

7

The CHS has advised that, as part of the fraud, the CHS, among other things: (a) used some of the money provided by new investors to pay out returns to other investors; and (b) created certain fraudulent documents to mislead and deceive certain investors and the SEC about the existence and extent of the assets of the Funds and related entities.

### The Conspiracy to Obstruct and the Obstruction of the SEC

14.   During 2010, in an effort to forestall discovery of the hole in the assets of the hedge funds the CHS advised, the CHS agreed with **GUILLEN**, the Middleman and others to fabricate hundreds of millions of dollars of assets purportedly held by STLF.

15.   Specifically, the CHS has advised that the CHS, **GUILLEN** and the Middleman agreed to create the Fictitious Asset Verification Letter that falsely represented that the STLF had at least $275 million in credits as a result of outstanding loans. The letter, which I have reviewed, was on the accounting firm's letterhead.  The CHS sought to create this false document in an effort to mislead and defraud investors and anyone questioning the value of STLF's assets, and then sought to use it to convince the SEC, among others, that STLF had adequate capital to protect its investors.  In or about early January 2011, the CHS caused this letter to be provided to the SEC in furtherance of the conspiracy to obstruct.

16.   The CHS has advised that, in order to carry out the conspiracy to obstruct and defraud the SEC, he agreed to pay in excess of $3 million to obtain the Fictitious Asset Verification Letter and fraudulent documents in support.  The CHS has explained that this sum of money was necessary to provide illicit payments to persons and entities in Venezuela to create fraudulent documentation in an effort to create the false impression that the loans did exist and were in fact assets of STLF.  The CHS has advised that both **GUILLEN** and the Middleman knew that the Fictitious Asset Verification Letter was false and that no such assets existed and no such loans were owed to STLF.

17.   The CHS has advised in sum and substance that the Middleman served the role of liaison between the CHS and **GUILLEN** and was tasked with ensuring that monetary payments were made to those persons and entities necessary to substantiate the false information in the Fictitious Asset Verification Letter.  In furtherance of the conspiracy to prevent the truth about the fraudulent assets from being discovered, and thereby obstruct the SEC investigation and the SEC Action, the Middleman used the JEISLO Real Estate Investment Company, as described below.

18.   The investigation has revealed that, in or about January 2011, while the SEC was conducting its enforcement-directed review of the MK Group and related entities, the CHS caused the Fictitious Asset Verification Letter, as well as a

9

separate letter the CHS had created requesting a review of the bogus loans by **GUILLEN**, to be supplied to the SEC.  The latter letter was created by the CHS on STLF letterhead and backdated so that it purported to be a request from him to the accountant for a verification of outstanding receivables of the STLF.

19.  Thereafter, on or about January 10, 2011, the SEC contacted **GUILLEN** in an effort to try to confirm whether the assets listed in the Fictitious Asset Verification Letter were real.  According to the SEC, at the time of the call, **GUILLEN** was vacationing in Miami, Florida.  The CHS has advised that, when **GUILLEN** learned of the SEC's involvement, he had expressed to the CHS his concern about dealing with the SEC, given that his accounting firm was connected with a large international accounting firm.  Nevertheless, when the SEC contacted **GUILLEN**, **GUILLEN** made further false statements confirming the existence of the loan portfolio referenced in the Fictitious Asset Verification Letter, when he well knew that no such assets existed.

20.  During his conversation with the SEC, **GUILLEN** told the SEC that he was introduced to the CHS by the Middleman, whom **GUILLEN** knew because of the Middleman's prior work at a financial institution in Venezuela.  **GUILLEN** told the SEC that the CHS and he had spoken about the CHS's desire for **GUILLEN** to perform certain agreed upon services to verify the existence of the

loans.  **GUILLEN** told the SEC that the Middleman had provided him with the list of companies in the loan portfolio, which list included the company addresses and the amount of each loan. **GUILLEN** further advised the SEC that he had spoken to all the companies that had outstanding loans with the CHS's group and that he was waiting for their responses to confirm the loans. **GUILLEN** told the SEC that he had received several informal letters and several loan agreements.  **GUILLEN** told the SEC that, for example, one company in the loan portfolio that had a $56 million loan balance had not provided him with documents, but that he had confirmed the loan balance by telephone.  He further advised the SEC that none of the companies had indicated that there was not a loan agreement.  **GUILLEN** also told the SEC that he had started contacting the companies in September or October 2010.  According to the SEC, **GUILLEN** was unable at the time of the interview to provide any names of any persons at the companies with whom he had spoken about the loans, but indicated he would do so at a later date.

21.  In furtherance of this conspiracy to obstruct, on or about January 12, 2011, the Middleman sent an email message to the CHS giving the CHS instructions on where to wire money that was part of the payoff for the Fictitious Asset Verification Letter.  The email sought payment of $1.9 million to an account at Bank of America in the name of an entity called JEISLO Real

Estate Investments LLC ("JEISLO").  A preliminary draft translation of the email indicates that the Middleman advised the CHS that the Middleman was working on a proposal involving a real estate matter, and that the investment would be reflected as that.  The preliminary draft translation reflects that the Middleman provided the bank account details, including the account number, the name of JEISLO, and the address of JEISLO, which the email reflects was 1872 NW 139 Av, Pembroke Pines, FL 33028.  The preliminary draft translation also reflects that the email notes at the end that the reason for the transfer related to a financing agreement SECTION 8 project.

22.  The CHS has advised, among other things, that the CHS did not actually have a loan portfolio in Venezuela with a list of companies and did not prepare a list of such loans for **GUILLEN**.  Rather, as **GUILLEN** advised the SEC, I have probable cause to believe, and do believe that the Middleman, a former banker in Venezuela, created the list of such fictitious loans and then furnished the list to **GUILLEN.**

23.  According to the CHS, the cover story in the Middleman's email is completely false as the CHS has admitted that there was no real estate financing or real estate deal of any kind between the CHS and the Middleman or JEISLO.  Rather, the CHS has advised that the request for the $1.9 million was partial payment of the more than $3 million the CHS agreed to pay

12

to have others create and fraudulently substantiate the phony
STLF assets described in the Fictitious Asset Verification
Letter.

24.  The CHS has admitted that in order to carry out the
conspiracy, payments needed to be made.  The CHS has advised that
the CHS requested that a third party make the payment.  The CHS
has also advised that the CHS understood that the third party
made this payment from an account in Switzerland.  The CHS has
also reported that the CHS understood that the third party made
two payments, one for approximately $1 million and the second for
approximately $250,000.

25.  The investigation shows that JEISLO is a Florida entity
with an address listed as 1872 NW 139th Ave., Pembroke Pines, FL
33028.  The listed owner of JEISLO is a woman whose initials are
B.B.  The address listed for JEISLO is the home address of B.B.
The investigation also reveals that B.B. is the wife of the
Middleman, and that the Middleman has been living at the address
listed for JEISLO since approximately 2009.

26.  I have reviewed bank records for an account at Bank of
America held in the name of "JEISLO Real Estate Investment LLC"
and ending in 9422 ("JEISLO Account #1").  The records reflect
that the account was opened by B.B. in our about February 2010.
The address on the account statements for JEISLO is 1872 NW 139th
Ave., Pembroke Pines, FL 33028-2839.  The bank records for this

13

account further reflect that, on or about January 24, 2011, this JEISLO account received a wire transfer of $1,000,000 from an originating bank in Geneva, Switzerland.  The bank records relating to this incoming wire contain the following notation: "Orig to Benef info: LOAN FOR REAL ESTATE INVESTMENT."  The records further reflect that, by the end of the following day, January 25, 2011, approximately $996,500 was transferred out of this account.

27.  The bank records further reflect that approximately $750,000 of the money referenced in the preceding paragraph was transferred on January 24, 2011 from JEISLO Account #1 to another Bank of America account in the name of "JEISLO Real Estate Investment LLC" and ending in 7068 ("JEISLO Account #2").  JEISLO Account #2 also has a mailing address on the statement of 1872 NW 139th Ave., Pembroke Pines FL 33028-2839.  Account information available to date suggests that this account was opened on or about January 13, 2011, the day after the Middleman sent the above-referenced email to the CHS seeking payment of the $1.9 million.  Just prior to the transfer of $750,000 into JEISLO Account #2 from JEISLO Account #1, the balance of JEISLO Account #2 was approximately $100.  Moreover, the records reflect that, on January 26, 2011, a wire transfer of approximately $338,000 was sent from this account to an account at Wachovia Bank.  In addition, on January 25, 2011 and January 31, 2011, respectively,

14

$50,000 and $20,000 were wired from JEISLO Account #2 back into to JEISLO Account #1.  The FBI is continuing to investigate where this money went.

28.  I have reviewed preliminary draft translations of various consensually recorded phone calls and other communications involving the CHS, **GUILLEN** and/or the Middleman. Those summaries include discussions relating to the Fictitious Asset Verification Letter.  In sum and substance, part of the discussions concern the CHS and the Middleman and/or the CHS, **GUILLEN** and the Middleman planning to make sure that they tell a consistent story to the SEC and the receiver.  They also discuss the need to complete the supporting documentation so that the companies that supposedly have outstanding loans to STLF will support the story if contacted by the SEC or the receiver.

29.  Based on the forgoing, there is probable cause to believe, and I do believe, that **JUAN CARLOS GUILLEN ZERPA** conspired to obstruct an official SEC proceeding, to obstruct justice and to defraud, among others, the SEC, in violation of 18 U.S.C. § 371, and committed, and knowingly aided and abetted the commission of, the crime of obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512 and 2. Accordingly, I request that a warrant issue for the arrest of **JUAN CARLOS GUILLEN ZERPA** on such charges.

15

30.   As noted above, the criminal investigation is ongoing. Accordingly, the undersigned requests that this Affidavit and the accompanying Complaint, as well as any Arrest Warrant, be sealed in the interest of avoiding compromising the ongoing investigation, until further order of the Court.

/S/
SPECIAL AGENT STACY G. BOWERY
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to before me on the 2nd day of March 2011, at Bridgeport, Connecticut.

/S/
WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

16