UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED
2011 MAY -4  P 4: 26

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:11cr76(SRU) |
| v. | VIOLATION:<br><br>18 U.S.C. § 1512(k) [Conspiracy to Obstruct an Official Proceeding]<br>18 U.S.C. § 981(a),<br>28 U.S.C. § 2461(c) [Forfeiture] |
| JUAN CARLOS GUILLEN ZERPA | |

INFORMATION

The United States Attorney charges:

COUNT ONE
(Conspiracy to Obstruct an Official Proceeding)

The Defendant

1. At all times relevant to this Information, JUAN CARLOS GUILLEN ZERPA ("GUILLEN"), the defendant herein, was a resident and citizen of Venezuela and the managing partner of a Venezuelan accounting firm associated with a major international accounting firm.

Named Co-Conspirator

2. At all times relevant to this Information, Francisco Illarramendi ("Illarramendi"), who is a co-conspirator charged in a separately filed document, was a resident of New Canaan, Connecticut, and earned millions of dollars in income by acting as an investment adviser to hedge funds. In the course of advising hedge funds, he agreed to and did invest the money supplied principally by foreign institutional and individual investors in various securities.

### Unnamed Co-Conspirator

3. At all times relevant to this Information, the defendant conspired with, among others, a Venezuelan citizen living in Pembroke Pines, Florida, who maintained control of a Florida bank account in the name of JEISLO Real Estate Investments, LLC ("JEISLO"). This individual will be referred to herein as "Co-conspirator #1."

### The Victim Agency

4. At all times relevant to this Information, the United States Securities and Exchange Commission ("SEC") was a federal government agency authorized by law to investigate possible violations of securities laws, conduct official enforcement investigations, and file civil actions to protect investors in connection with the purchase and sale of securities.

### Other Relevant Entities

5. At times relevant to this Information, Illarramendi was:

(a) a partner in a United States-based investment adviser registered with the SEC (the "Registered Adviser"); and

(b) the majority owner and control person of a group of related entities organized under the name Michael Kenwood Group, LLC ("MK Group") located in Stamford, Connecticut.

6. At times relevant to this Information, Illarramendi and MK Group, through Michael Kenwood Capital Management, LLC ("MK Capital"), advised and operated hedge funds, including the Short Term Liquidity Fund, I Ltd. ("STLF"), MK Venezuela, Ltd. ("MK VZ") and the MK Special Opportunities Fund, Ltd. ("MKSOF"). In addition, in his role at the Registered Adviser, Illarramendi advised and operated several hedge funds. The various hedge funds advised by Illarramendi will be referred to herein collectively as the "FUNDS."

7. At all times relevant to this Information, MK Group and MK Capital and related entities were not registered with the SEC as investment companies, investment advisers, broker-dealers, or in any other capacity.

## The Scheme to Defraud

8. In or about 2005 and 2006, one of the investments Illarramendi made on behalf of certain of the hedge funds managed by the Registered Adviser suffered losses of millions of dollars caused by external market forces. Rather than disclose to the investors the truth about these losses, Illarramendi intentionally chose to conceal this information from the investors by engaging in a scheme and artifice to defraud and mislead investors and creditors to prevent the truth about the actual value of the FUNDS from being discovered. Illarramendi solicited additional investments on behalf of the FUNDS and obtained loans from creditors, which he used in part to pay redemption requests to fund investors and to satisfy obligations owed to creditors. As a result of the scheme, the FUNDS currently have outstanding liabilities that greatly exceed the true value of the FUNDS' assets and expose the investors to the risk of suffering losses of hundreds of millions of dollars.

9. The purpose of the scheme and artifice to defraud was for Illarramendi to conceal the gap between the assets and liabilities (the "Hole") of the FUNDS and other related entities by seeking to avoid redemption of the investments made by investors and soliciting new money from investors and creditors that enabled him to: (a) provide promised returns to investors whose investments had reached maturity; (b) use the new money to seek to generate sufficient profits to fill the Hole; and (c) forestall and prevent the discovery of the Hole by his investors, creditors and the SEC.

## The SEC Investigation and Civil Action

10. Beginning in 2010, the SEC, as part of its official investigative and enforcement authority, sought information and documentation from Illarramendi and MK Group in an official SEC enforcement matter bearing SEC File # B-2507.

11. As part of its enforcement authority, the SEC served a subpoena for records upon, among others, MK Group. In December 2010 and January 2011, the SEC conducted an enforcement-directed review of MK Group and related entities as part of its official enforcement investigation.

12. On or about January 14, 2011, the SEC filed a civil action styled *SEC v. Illarramendi, et al., 3:11-CV-00078 (JBA)* ("SEC Civil Action"), seeking, among other things, to enjoin Illarramedi and entities related to MK Group from violating the federal securities laws and to submit an accounting of investor funds. Subsequent to the filing of the SEC Civil Action, the court appointed, and sought input from, business advisers and a receiver to ascertain the assets and liabilities of the hedge funds affiliated with MK Group, among other tasks.

## The Conspiracy to Obstruct an Official SEC Proceeding

13. From in or about October 2010 to on or about March 3, 2011, in the District of Connecticut and elsewhere, GUILLEN, Co-conspirator #1, and others, including Illarramendi, who participated until on or about February 8, 2011, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other and other persons, known and unknown, to commit an offense against the United States by corruptly, knowingly and willfully obstructing and influencing an official proceeding being conducted by the SEC in SEC File # B-2507 and the SEC Civil Action, contrary to Title 18, United States Code, Section 1512(c)(2).

### The Purpose of the Conspiracy

14. The principal goal of the conspiracy was to impede the SEC's ability to discover the truth in its official investigation in SEC File # B-2507 and in the SEC Civil Action.

### Means Employed to Further the Conspiracy

15. It was part of the conspiracy that, in or about 2010, Illarramendi attempted to conceal the Hole in the FUNDS by creating fictitious assets purportedly worth hundreds of millions of dollars. Specifically, he requested that GUILLEN and Co-conspirator #1 assist him in falsely verifying that STLF had at least approximately $275 million of assets in the form of credits as a result of outstanding loans purportedly owed to STLF by Venezuelan companies. GUILLEN and Co-conspirator #1 agreed to do so. In furtherance of the illicit agreement, GUILLEN, Co-conspirator #1 and Illarramendi agreed to create a fraudulent and fictitious letter (the "Fictitious Asset Verification Letter"), which falsely attested to the existence of at least approximately $275 million in credits owed to STLF. Illarramendi arranged for the creation of the Fictitious Asset Verification Letter to further mislead and deceive investors and the SEC into believing that there was adequate capital and credit to protect the investors of STLF.

16. It was further part of the conspiracy that GUILLEN, Co-conspirator #1 and Illarramendi created and caused others to create additional false and fraudulent documents in an effort to support the credits reflected in the Fictitious Asset Verification Letter. The co-conspirators also agreed to pay persons working for the Venezuelan companies that supposedly owed STLF money so that those persons would support the false story about the phony STLF assets.

17. It was further part of the conspiracy that GUILLEN, Co-conspirator #1 and Illarramendi agreed that Illarramendi would pay more than $3 million in furtherance of the effort to fraudulently substantiate the Fictitious Asset Verification Letter.

18. At the outset of the conspiracy, Illarramendi advised GUILLEN and Co-conspirator #1 that he needed the Fictitious Asset Verification Letter for internal purposes at the MK Group. Eventually, in or about January 2011, GUILLEN and Co-conspirator #1 learned that Illarramendi had caused the letter to be given to the SEC in an effort to deceive the SEC in connection with its ongoing investigation. Rather than withdraw from the illicit agreement at that time, GUILLEN and Co-conspirator #1, along with Illarramendi and others, willfully made, and caused to be made, false representations to the SEC claiming that the loans referenced in the Fictitious Asset Verification Letter actually existed, when they knew full well that they did not.

19. In furtherance of the conspiracy, GUILLEN, Co-conspirator #1 and Illarramendi agreed to deceive and mislead the SEC in connection with its investigation in SEC File # B-2507 and to deceive and mislead the SEC, the receiver and the court-appointed business advisers in connection with the SEC Civil Action. They did so by seeking to create false documentation to provide to the SEC, the receiver and the court-appointed business advisers about the purported existence of STLF credits reflected in the Fictitious Asset Verification Letter, when the co-conspirators knew that no such credits existed.

20. In furtherance of the conspiracy, in or about January 2011, Illarramendi caused the Fictitious Asset Verification Letter to be provided to the SEC and the court-appointed business advisers.

21. In furtherance of the conspiracy, Illarramendi caused two transfers of funds totaling $1,250,000 to be made to the JEISLO account held by Co-conspirator #1. At least $250,000 of these proceeds were transferred for the benefit of GUILLEN.

## OVERT ACTS

22. In furtherance of the conspiracy and to effect the objects thereof, GUILLEN, Co-conspirator #1, Illarramendi and their co-conspirators committed, and caused to be committed, the following overt acts, among others, in the District of Connecticut and elsewhere:

   a. On or about January 6, 2011, GUILLEN caused an email to be sent to Illarramendi attaching the Fictitious Asset Verification Letter.

   b. In or about January 2011, Illarramendi caused the Fictitious Asset Verification Letter to be provided to the SEC.

   c. In or about January 2011, Illarramendi caused the Fictitious Asset Verification Letter to be provided to the court-appointed business advisers.

   d. On or about January 10, 2011, GUILLEN participated in a telephone call with representatives of the SEC in which he made false representations about the purported loans referenced in the Fictitious Asset Verification Letter.

   e. On or about January 12, 2011, Co-conspirator #1 sent an email to Illarramendi directing him to make a payment of $1.9 million to a bank account in the name of JEISLO Real Estate Investments, LLC ("JEISLO Account #1"), and falsely represented in the email that the payment was for a real estate transaction when in fact it was intended as a partial payment of the agreed-upon fee for the Fictitious Asset Verification Letter.

f.  On or about January 24, 2011, Illarramendi caused a third party to make a wire transfer of $1,000,000 to JEISLO Account #1 as partial payment for the Fictitious Asset Verification Letter.

g.  On or about February 1, 2011, Illarramendi caused an additional payment of $250,000 to be made by a third party to JEISLO Account #1 as partial payment of the fees and costs for the Fictitious Asset Verification Letter.

h.  On or about February 1, 2011, Co-conspirator #1 caused $250,000 to be transferred to a third party for the benefit of GUILLEN, which constituted partial payment to GUILLEN for the Fictitious Asset Verification Letter.

i.  On or about February 11, 2011, GUILLEN and Co-conspirator #1 participated in a telephone call in which they discussed, in sum and substance, the plan for deceiving the SEC and the court-appointed business advisers about the bogus credits reflected in the Fictitious Asset Verification Letter.

j.  On or about February 14, 2011, GUILLEN and Co-conspirator #1 participated in a telephone call in which they discussed, in sum and substance, the plan for deceiving the SEC, the court-appointed receiver and the court-appointed business advisers about the bogus credits reflected in the Fictitious Asset Verification Letter.

k.  On or about March 3, 2011, GUILLEN and Co-conspirator #1 attended a meeting in Miami, Florida, at which they discussed the ongoing effort to deceive the SEC by trying to pass off the Fictitious Asset Verification Letter as legitimate.

All in violation of Title 18, United States Code, Section 1512(k).

## FORFEITURE ALLEGATION UNDER 28 U.S.C. § 2461(c) & 18 U.S.C. 981(a)
(Conspiracy to Obstruct an Official Proceeding )

Upon conviction on Count One of this Information for conspiracy to obstruct an official proceeding, JUAN CARLOS GUILLEN ZERPA, the defendant herein, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violation of 18 U.S.C. § 1512(k), including, but not limited to, the following:

Financial Account:

An interest up to the amount of $250,000 transferred on or about February 1, 2011 to an account at Wells Fargo Bank, N.A. with an account number ending in 3377 bearing the name of an entity with the initials FC LLC.

Money Judgment:

A sum of money in the amount of $250,000, which constitutes the total amount of proceeds known to have been obtained as a result of the conspiracy to obstruct an official proceeding charged in Count One of this Information.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

All in accordance with 18 U.S.C. § 981(a)(1), as incorporated by 28 U.S.C. § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

DAVID B. FEIN
UNITED STATES ATTORNEY

RICHARD J. SCHECHTER
SENIOR LITIGATION COUNSEL

PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY